Matthew J. Orme (USB 13323)
Kyle K. Tucker (USB 19720)
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main Street, Ste. 2400
Salt Lake City, UT 84111
(801) 415-3000
matt.orme@dentons.com
kyle.tucker@dentons.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BAM FRANCHISING, INC., a Delaware corporation,<br><br>Plaintiff,<br>vs.<br><br>DOES 1-10,<br><br>Defendants. | **COMPLAINT**<br><br>Civil Case No. ______________<br>Judge ____________<br><br>**JURY DEMANDED** |

Plaintiff BAM Franchising, Inc. ("Plaintiff") hereby complains of Defendants John Does 1-10 ("Defendants") as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware, doing business throughout the United States, including its principal place of business in Utah County, State of Utah.

2. Defendants are individuals and/or entities whose true names and capacities are currently unknown to Plaintiff. When Plaintiff ascertains the true names and capacities of such Defendants, Plaintiff will amend this Complaint to state their true names and capacities. Plaintiff

is informed and believes and thereon alleges that each of the Defendants is legally responsible in some manner for the events, happenings, and/or damages alleged herein.

3. Plaintiff has been unable to identify the Defendants through its own investigation and requires third-party discovery, including subpoenas to internet service providers, hosting companies, and other entities, to ascertain the identities of the individuals responsible for the unauthorized disclosures alleged herein.

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. § 1836.

5. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because, upon information and belief, the parties are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

6. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same case or controversy as the federal claim.

7. This Court has personal jurisdiction over the Defendants because, upon information and belief, each Defendant transacts business in and/or has sufficient minimum contacts with the State of Utah such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. Further, upon information and belief, one or more of the Defendants committed the acts and omissions giving rise to the claims alleged herein within the State of Utah, and/or purposefully directed activities at the State of Utah, and/or caused injury within the State of Utah that the Defendants knew or should have known would occur in this forum, thereby subjecting themselves to the jurisdiction of this Court pursuant to Utah's long-arm statute, Utah

Code Ann. § 78B-3-205, and consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to one or more of the claims at issue occurred within this district.

## GENERAL ALLEGATIONS

9. Plaintiff is in the business of franchising retail stores that specialize in the buying, selling, and trading of LEGO products and related merchandise under the "Bricks & Minifigs" brand.

10. As part of its franchise system, Plaintiff has developed and maintains confidential and proprietary information, trade secrets, and copyrighted materials essential to the operation of its franchise network.

11. Plaintiff's confidential and proprietary materials include, but are not limited to: (a) the Bricks & Minifigs Franchisee Training & Operations Manual, Edition V.10.6.24 (the "Operations Manual"), a comprehensive document of approximately 311 pages containing nineteen operational sections and appendices concerning franchise operations, financial procedures, customer service, safety, inventory, purchasing, pricing, vendors, loss prevention, brand standards, marketing, hiring, recruiting, and related subjects; (b) confidential internal store-performance analyses, including workbooks containing store-level sales data, ticket counts, average-ticket information, margins, historical comparisons, and Plaintiff's proprietary analytical categories and methodologies; (c) internal corporate communications distributed to franchisees; (d) internal crisis-response materials and franchisee talking points, including the "Franchisee Field Guide & Talking Points" and the "Confidential Incident Impact Report"; (e) private internal Slack

communications among Plaintiff's personnel and franchisees; (f) franchisee support portal materials containing operational and marketing processes; (g) Plaintiff's Brand Review presentation, which contains confidential franchise system information provided only to prospective franchisees who have signed confidentiality agreements; and (h) Plaintiff's Freshdesk knowledge base containing 52 proprietary articles relating to franchise operations, troubleshooting, vendor information, and other operational processes (collectively, the "Confidential Information").

12. Plaintiff's Confidential Information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use, including Plaintiff's competitors.

13. Plaintiff has taken reasonable efforts under the circumstances to maintain the secrecy of its Confidential Information:

a) The Operations Manual expressly states on its first page that it is intended for franchise owners only, is not to be shared with employees or anyone outside the company, and that unauthorized sharing constitutes a breach of Plaintiff's confidentiality obligations;

b) Plaintiff's Brand Review presentation is provided to prospective franchisees only after they sign a confidentiality agreement;

c) Plaintiff's internal communications, store-performance analyses, and crisis-response materials are distributed only within the franchise system on secure internal systems and are not made available to the public;

d) Plaintiff's Freshdesk knowledge base (bamfran.freshdesk.com) is accessible only through individual accounts created for each franchisee during their social

media setup call, and contains proprietary operational articles not available to the public;

14. Upon information and belief, one or more of the Defendants are current or former franchisees, employees, or other persons who obtained access to Plaintiff's Confidential Information pursuant to contractual obligations.

15. Plaintiff's Franchise Agreement contains express provisions requiring franchisees to maintain the confidentiality of Plaintiff's proprietary information, including the Operations Manual, vendor and supplier relationships, promotional programs, POS systems and software, advertising and marketing materials, customer-service standards, business strategies, operating procedures, purchasing strategies, merchandising methods, cost and pricing strategies, inventory-management methods, and the economic and financial characteristics of the franchise system.

16. The Franchise Agreement provides that, during the term and following expiration or termination, franchisees may not divulge Confidential Information without Plaintiff's prior written consent, must maintain the confidentiality of the information, must refrain from making unauthorized copies, and must implement reasonable procedures prescribed by Plaintiff to prevent unauthorized use or disclosure.

17. Beginning in or around May 2026 and continuing through September 2026, Plaintiff's Confidential Information has been systematically leaked and published on third-party websites, including thebammap.com and bamopsmanual.com.

18. On or about May 28, 2026, an internal Plaintiff corporate communication that had been distributed to franchisees concerning an ongoing matter was leaked and published in a YouTube video, which expressly solicited additional leaked documents.

19. By August 11, 2026, private internal Slack communications among Plaintiff's personnel and franchisees began being published and transcribed on thebammap.com website.

20. These confidential Slack communications included communications between franchisees, communications involving Plaintiff's personnel, and in several instances the site reconstructed internal discussions in considerable detail, including discussions concerning YouTube/social-media attacks, internal responses concerning Plaintiff ownership and management, franchisee discussions concerning purchasing and pricing practices, internal logistics discussions concerning shipment problems, and internal discussions concerning the franchisee association, which could only have been leaked by someone with insider access.

21. On or about August 20, 2026, thebammap.com published Plaintiff's complete "Franchisee Field Guide & Talking Points" regarding a settlement matter.

22. The website expressly stated that the document was "obtained by this site."

23. On or about August 26, 2026, thebammap.com published Plaintiff's internal crisis-PR and story-angles plan, as well as extensive content from Plaintiff's August 25 Q3 franchise town hall, including the franchisee survey, the "Rebuild Trust. Rebuild Traffic" 60-day plan, internal marketing plans and timelines, discussion concerning review-removal services, and lengthy leadership remarks.

24. On or about August 27, 2026, thebammap.com published a June 24, 2026 letter to franchise owners from Plaintiff's board chairman concerning internal franchise matters.

25. On or about September 3, 2026, thebammap.com published information from Plaintiff's confidential internal store-performance analysis dated June 30, 2026.

26. The confidential internal store-performance analysis contains five sheets: a Summary, a weekly dashboard, and April, May, and June store-level tables. The workbook

includes store-level sales, ticket counts, average-ticket information, margins, historical comparisons, and Plaintiff's proprietary internal categorization of stores using analytical categories labeled "The Impacted," "Consistent Struggles," "Resilient Performers," "The Turnarounds," and "The Bounce-Backs."

27. thebammap.com itself described the September 2026 store-performance workbook as the "whole leaked file" and, in its source disclosure, described the source of Plaintiff's internal store-performance analysis as "protected."

28. Unlike other material, the site did not claim that it discovered this workbook on a publicly exposed Plaintiff system, indicating the information was provided by an insider source.

29. Plaintiff submitted the material to Vercel, Inc. ("Vercel") in a September 8, 2026 DMCA notice, who informed Plaintiff that it was providing the site owner an opportunity to remove the material.

30. On September 11, 2026, Vercel informed Plaintiff that the owner of the reported URLs had removed the complained-of material.

31. A separate website, bamopsmanual.com, was created to reproduce Plaintiff's complete Franchisee Training & Operations Manual, Edition V.10.6.24.

32. Bamopsmanual.com now reproduces the entire manual through page 311, including all nineteen numbered sections, recruiting and hiring appendices, the glossary, and a companion Plaintiff Vendor Directory.

33. Bamopsmanual.com continued publishing additional sections after Plaintiff's initial complaints, demonstrating an ongoing ability to obtain and publish Plaintiff's proprietary materials rather than a single historical disclosure.

34. The DMCA notice also requested that Vercel preserve records related to the infringing accounts and deployments, including subscriber information, IP logs, and historical data, pending legal action.

35. On or about September 8, 2026, Plaintiff submitted a formal DMCA takedown notice to Vercel identifying specific infringing URLs on thebammap.com that reproduced or linked to full copies of Plaintiff's copyrighted works, including the Confidential Incident Impact Report, the Franchisee Field Guide & Talking Points, and the Franchisee Training & Operations Manual.

36. On September 17, 2026, thebammap.com disclosed that a person identifying himself or herself as a current Plaintiff franchisee had contacted the site anonymously through its right-of-reply mechanism.

37. The franchisee contacted the site to correct its prior reporting concerning stores disappearing from Plaintiff's website and provided information about franchisee experiences with an internal platform migration.

38. The flow of nonpublic Plaintiff information to thebammap.com continued after Plaintiff's September 8, 2026 notice to Vercel and after the site operator had been placed on notice concerning Plaintiff's internal materials.

39. On September 12, 2026, Plaintiff's Marketing Director published an internal announcement to Plaintiff's all-franchisee Slack announcement channel advising franchisees that Plaintiff was aware of a potential threat and that corporate was taking "swift, decisive, and appropriate action."

40. thebammap.com obtained the internal announcement and published or reconstructed it on the same day.

41. On September 18, 2026, thebammap.com published an account of a nonpublic communication between Plaintiff's West Coast franchise business coach and a franchisee in her region concerning the closure of the Southeast Tucson location.

42. According to thebammap.com, this was not a public Plaintiff statement, press release, filing, or public social-media comment—it was a communication from Plaintiff's regional business coach to an owner in her region, and the substance of that communication reached thebammap.com.

43. On September 23, 2026, thebammap.com published the dates and specific hotel location of Plaintiff's upcoming private owners conference. This disclosure of the nonpublic location of a future gathering at which a large number of franchise owners will be physically present in one location creates a significant physical-security concern, as it materially increases the risk of targeted harassment, disruption, confrontation, or other harmful conduct against Plaintiff's franchisees and staff.

44. The pattern of disclosures, the nature of the materials disclosed, the continuing flow of internal materials after Plaintiff began issuing takedown demands and investigating the source, and the statements made on the publishing websites demonstrate that at least one person with legitimate access to Plaintiff's franchise-system information has been providing Confidential Information outside the system, either directly to thebammap.com or to third parties who then provide it to thebammap.com.

45. Upon information and belief, Plaintiff has identified at least one current or former franchisee as a suspected source of the leaked Confidential Information based on internal investigation, including review of Google Drive audit logs and system access records.

46. The Defendants' unauthorized disclosure of Plaintiff's Confidential Information has caused and continues to cause substantial harm to Plaintiff.

47. Plaintiff has lost control over information it contractually and operationally restricts to the franchise system.

48. Once internal information is published on the open Internet, the confidentiality cannot simply be restored by later removing a particular URL.

49. The disclosed materials provide information that would otherwise require a competitor, prospective competitor, vendor, prospective franchisee, or other third party to independently develop or negotiate, including vendor and supplier relationships, purchasing procedures, pricing methods, product valuation procedures, operational standards, internal financial characteristics, store performance, system weaknesses, marketing strategy, and internal franchise-system processes.

50. The leaked materials have also been used as the basis for public stories and videos concerning Plaintiff and its franchise system.

51. Internal communications and internal discussions that were never intended to constitute public corporate statements have been selectively published and used as source material for public criticism of Plaintiff.

52. Plaintiff's personnel have had to spend substantial time and incur expense identifying leaked material, comparing published documents against Plaintiff originals, reviewing audit logs and access records, determining whether systems were compromised, documenting URLs, preserving evidence, preparing copyright notices, and communicating with service providers.

53. Upon information and belief, Plaintiff's investigation has revealed evidence that one or more individuals with franchisee-level access to Plaintiff's internal systems downloaded confidential documents from Plaintiff's Google Drive and subsequently provided those documents to third parties for publication on thebammap.com and related websites.

54. Plaintiff has exhausted all reasonably available means to identify the Defendants through its own investigation, including reviewing internal audit logs, system access records, and conducting internal inquiries. Plaintiff's internal investigation has narrowed but not conclusively identified the source or sources of the leaks.

55. Despite diligent investigation, Plaintiff has been unable to definitively identify the individuals responsible for the unauthorized disclosures alleged herein. The persons who leaked Plaintiff's Confidential Information have concealed their identities by providing materials anonymously to third-party websites and by using the websites' anonymity protections.

56. Third parties possess information necessary to identify the Defendants. Specifically, Vercel, Inc., the hosting provider for thebammap.com, possesses subscriber information, account records, IP address logs, deployment records, and other information that may identify the operator of thebammap.com website and the individuals who provided Plaintiff's Confidential Information to that website.

57. The hosting provider for bamopsmanual.com possesses subscriber information, account records, IP address logs, and other information that may identify the operator of that website and the individuals who provided Plaintiff's Franchisee Training & Operations Manual to that website.

58. Google LLC possesses records concerning access to and downloads from Plaintiff's Google Drive, including IP address logs, user identification information, timestamps, and file

access histories that may identify the individuals who downloaded Plaintiff's Confidential Information for unauthorized disclosure.

59. Slack Technologies, LLC possesses records concerning Plaintiff's internal Slack workspace, including message logs, user activity records, and access logs that may identify individuals who copied or disclosed private internal Slack communications to unauthorized third parties.

60. YouTube, LLC possesses records concerning the YouTube channel and video that published Plaintiff's leaked internal communication on or about May 28, 2026, including account holder information, IP address logs, and upload records that may identify the individuals who provided Plaintiff's Confidential Information to that channel.

61. The information sought from these third parties is not publicly available, is not available from any other source, and cannot be obtained without judicial process. Plaintiff requires the ability to issue subpoenas to these third parties to obtain the information necessary to identify the Defendants and amend this Complaint to name them.

62. Plaintiff has a good faith basis to believe that the subpoenas it intends to issue will lead to information identifying the Defendants. The pattern of disclosures, the nature of the materials disclosed, the timing of the disclosures, and statements made on the publishing websites all indicate that one or more persons with insider access to Plaintiff's franchise system have been systematically leaking Confidential Information, and records held by the third parties identified above will assist in identifying those persons.

## FIRST CLAIM FOR RELIEF
**(Breach of Contract, Including Breach of the Implied Covenant of Good Faith and Fair-Dealing)**

63. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

64. Upon information and belief, one or more of the Defendants entered into one or more valid written agreements with Plaintiff, including franchise agreements, confidentiality agreements, nondisclosure agreements, and/or employment agreements (collectively, the "Agreements").

65. The Agreements contain express provisions requiring the Defendants to maintain the confidentiality of Plaintiff's proprietary and confidential information, including the Confidential Information, and to refrain from disclosing such information to third parties or using it for purposes other than those authorized by Plaintiff.

66. Plaintiff performed all conditions, covenants, and promises required of it under the Agreements, or such performance was waived or excused.

67. The Defendants breached the Agreements by disclosing, distributing, and/or providing Plaintiff's Confidential Information to unauthorized third parties, including the operators of thebammap.com and bamopsmanual.com, YouTube content creators, and others, without Plaintiff's authorization or consent.

68. The Defendants' disclosures include, but are not limited to: (a) Plaintiff's internal store-performance workbook containing proprietary sales data and analytical methodologies; (b) internal corporate communications distributed to franchisees; (c) private internal Slack communications; (d) Plaintiff's Franchisee Field Guide & Talking Points; (e) Plaintiff's internal

crisis-response and public relations materials; (f) content from Plaintiff's Q3 franchise town hall; and (g) Plaintiff's complete Franchisee Training & Operations Manual.

69. Every contract in Utah contains an implied covenant of good faith and fair dealing which obligates the parties to a contract to act in good faith to preserve each other's rights and benefits under the contract.

70. The Defendants breached the implied covenant of good faith and fair dealing by intentionally undermining the purposes of the Agreements and Plaintiff's reasonable expectations thereunder.

71. The Defendants' systematic disclosure of Plaintiff's most sensitive internal business information to hostile third parties for the purpose of harming Plaintiff and its franchise system violated the implied covenant inherent in the Agreements.

72. As a direct and proximate result of the Defendants' breaches, Plaintiff has suffered damages in an amount to be proven at trial, including but not limited to: harm to the value and secrecy of its proprietary business information; harm to its competitive position; harm to its relationships with franchisees; costs incurred to investigate and remediate the unauthorized disclosures; and attorneys' fees and costs.

**<u>SECOND CLAIM FOR RELIEF</u>**
**(Misappropriation under Utah Uniform Trade Secrets Act, Utah Code § 13-24-1)**

73. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

74. Plaintiff's Confidential Information constitutes "trade secrets" within the meaning of the Utah Uniform Trade Secrets Act, Utah Code § 13-24-2(4), because: (a) it consists of information, including compilations, methods, techniques, and processes; (b) it derives independent economic value, actual or potential, from not being generally known to, and not being

readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (c) it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

75. In particular, Plaintiff's internal store-performance analysis, including the Confidential Incident Impact Report workbook, contains proprietary analytical categories, methodologies, and compilations that derive independent economic value from their secrecy; Plaintiff's Franchisee Training & Operations Manual contains proprietary operating information, processes, and methods that derive independent economic value from their secrecy; and Plaintiff's "Resolution Strategy – Corporate & Social Media" contains internal communications, crisis-response materials, and strategic planning documents that derive independent economic value from their secrecy.

76. Plaintiff has taken reasonable efforts to maintain the secrecy of its trade secrets, including: restricting access to Confidential Information to authorized personnel and franchisees; requiring confidentiality agreements and imposing confidentiality obligations; marking materials as confidential or proprietary; maintaining materials on secure internal systems; and taking enforcement action against unauthorized disclosures.

77. Upon information and belief, the Defendants misappropriated Plaintiff's trade secrets within the meaning of Utah Code § 13-24-2(2) by disclosing Plaintiff's trade secrets without express or implied consent, while knowing or having reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain secrecy or limit use.

78. Upon information and belief, the Defendants disclosed Plaintiff's trade secrets by breaching their duty to maintain secrecy imposed by the Agreements and Plaintiff's

Confidentiality Obligations, which constitutes "improper means" as defined by Utah Code § 13-24-2(1).

79. The Defendants' misappropriation was willful and malicious. The Defendants deliberately disclosed Plaintiff's most sensitive internal business information to hostile third parties with the purpose and intent of harming Plaintiff and its franchise system.

80. The continuing and systematic nature of the disclosures, the solicitation of additional leaked documents, and the statements on the publishing websites demonstrate willful and malicious conduct.

81. As a direct and proximate result of the Defendants' misappropriation, Plaintiff has suffered damages in an amount to be proven at trial, including actual loss and unjust enrichment caused by the misappropriation, pursuant to Utah Code § 13-24-4(1).

82. Plaintiff is entitled to exemplary damages in an amount not exceeding twice any compensatory damages award, pursuant to Utah Code § 13-24-4(2) because the Defendants' misappropriation was willful and malicious.

83. Plaintiff is entitled to recover its reasonable attorneys' fees pursuant to Utah Code § 13-24-5 because the Defendants' misappropriation was willful and malicious.

84. By reason of the above-described misappropriation of trade secrets, immediate injunctive relief is required to prevent further improper use and disclosure of Plaintiff's trade secrets. Utah Code § 13-24-3.

## THIRD CLAIM FOR RELIEF
**(Misappropriation under Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(3))**

85. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

86. Plaintiff's Confidential Information constitutes "trade secrets" within the meaning of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(3), because: (a) it consists of financial, business, technical, and economic information; (b) Plaintiff has taken reasonable measures to keep such information secret; and (c) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use.

87. Plaintiff's trade secrets are related to products and services used in, or intended for use in, interstate or foreign commerce.

88. Plaintiff operates a nationwide franchise system with franchisees located in multiple states. Plaintiff's Confidential Information, including its Operations Manual, store-performance analyses, and franchisee communications, relates to products and services sold and distributed across state lines through Plaintiff's interstate franchise network.

89. Plaintiff has taken reasonable measures to keep its trade secrets secret, including: (a) restricting access to Confidential Information to authorized personnel and franchisees with a business need to know; (b) requiring franchisees, employees, and others with access to the information to sign confidentiality or nondisclosure agreements; (c) maintaining materials on password-protected and secure internal systems; (d) marking materials as confidential or proprietary; (e) expressly stating in the Operations Manual that it is intended for franchise owners only and is not to be shared outside the company; and (f) taking enforcement action against unauthorized disclosures.

90. The Defendants misappropriated Plaintiff's trade secrets within the meaning of 18 U.S.C. § 1836 by disclosing Plaintiff's trade secrets without express or implied consent, while

knowing or having reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain secrecy or limit use.

91. The Defendants breached their duties to maintain secrecy imposed by the Agreements and Plaintiff's Confidentiality Obligations by disclosing Plaintiff's trade secrets to unauthorized third parties, which constitutes "improper means" as defined by 18 U.S.C. § 1836.

92. The Defendants' disclosures of Plaintiff's trade secrets occurred between May 2026 and September 2026, well after the DTSA's effective date (May 11, 2016).

93. The Defendants' misappropriation was willful and malicious as Defendants deliberately disclosed Plaintiff's most sensitive internal business information to hostile third parties with the purpose and intent of harming Plaintiff and its franchise system.

94. The continuing and systematic nature of the disclosures, the solicitation of additional leaked documents, and the statements on the publishing websites demonstrate willful and malicious conduct.

95. As a direct and proximate result of the Defendants' misappropriation, Plaintiff has suffered damages in an amount to be proven at trial, including actual loss and unjust enrichment caused by the misappropriation, pursuant to 18 U.S.C. § 1836(b)(3)(B).

96. Plaintiff is entitled to exemplary damages in an amount not more than two times the amount of damages awarded, pursuant to 18 U.S.C. § 1836(b)(3)(C) because the Defendants' misappropriation was willful and malicious.

97. Plaintiff is entitled to recover its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because the Defendants' misappropriation was willful and malicious.

## PRAYER FOR RELIEF

Plaintiff prays for relief as follows:

1. For a judgment against Defendants in an amount to be proved at trial, plus pre- and post-judgment interest, and costs and attorneys' fees to the full extent permitted by law or in equity.

2. For such other and further relief the Court deems just and equitable.

3. Plaintiff demands a jury.

DATED: September 25, 2026

**DENTONS DURHAM JONES PINEGAR P.C.**

*/s/ Matthew J. Orme*
Matthew J. Orme
Kyle K. Tucker

*Attorneys for Plaintiff BAM Franchising, Inc.*

Plaintiff's Address:

4844 North 300 West, Ste. 202
Provo, Utah 84604