GREGORY C. BELMONT
% CereBel Legal Intelligence
157 East 86th Street, 4th Floor
New York, NY 10028
Telephone (631) 506-8464
belmont@cerebel.law
Proposed Amicus Curiae, appearing on his own behalf

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| BAM FRANCHISING, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DOES 1–10,<br><br>Defendants. | **[PROPOSED] AMICUS CURIAE MEMORANDUM IN SUPPORT OF ANONYMOUS NON-PARTY PUBLISHER'S EMERGENCY MOTION TO VACATE OR MODIFY ORDER GRANTING EXPEDITED DISCOVERY, TO QUASH OR MODIFY SUBPOENAS, AND FOR PROTECTIVE ORDER (ECF 23)**<br><br>Case No. 2:26-cv-00895-DBB-DBP<br><br>District Judge David Barlow<br>Magistrate Judge Dustin B. Pead |

**Identity and interest.** Proposed Amicus Gregory C. Belmont regularly reads the Publisher's website, The BAM Map (thebammap.com), operated a website providing legal information and news of broad interest, and produced and published a widely distributed video documenting police misconduct cited in successful civil-rights litigation against the nation's largest police department. ECF 8-2 ¶¶ 3, 5–7; *BAM Franchising, Inc. v. Schneider, No. 2:26-cv-00593-DBB-CMR, ECF 10-1* ¶ *2.* His memorandum supplements the Publisher's presentation with a reader's perspective on the public concerns implicated by the business

practices and police involvement of Plaintiff BAM Franchising, Inc. ("BAM"), addressing Plaintiff's contention that public interest in its other disputes does not justify publication of its confidential business information or absolute anonymity for the Publisher and its sources, ECF 31 at 8. It further explains their weight in the disclosure balance under *Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 438 (10th Cir. 1977) and* supports the protective relief requested in ECF 23.

**Authorship and funding.** No party's counsel authored any part of this memorandum; no party or its counsel contributed money; and no one other than Movant contributed money or effort to its preparation.

**ARGUMENT**

**A. Public concern bears directly on the disclosure balance.** BAM argues that its "involvement in other proceedings or matters that have attracted public attention does not place every aspect of its business in the public domain," or warrant "an absolute protection of anonymity." Pl.'s Opp'n at 8, ECF 31 ("Opp."). The Publisher seeks qualified protection under a balancing test, not absolute anonymity, ECF 23 at 8–9, and this memorandum does not contend that publicity strips BAM's information of confidentiality. The question is how much weight the reporting's public value deserves when the Court balances disclosure against newsgathering interests, including under the fourth *Silkwood* factor, "[t]he type of controversy." *Silkwood*, 563 F.2d at 438; see *Grandbouche v. Clancy,* 825 F.2d 1463, 1466–67 (10th Cir. 1987) (requiring assessment of First Amendment and competing disclosure interests before ordering disclosure). Whether information is confidential and whether reporting about it addresses a matter of public concern are different questions. Confidentiality bears on BAM's side of that balance; it does not resolve the other. BAM's own authority ties protection for anonymous speakers to "the

importance of the type of speech." Opp. at 8 (quoting *Doe v. Shurtleff*, No. 1:08-CV-64-TC, 2009 WL 2601458, at *4 (D. Utah Aug. 20, 2009)). Speech on "a subject of legitimate news interest" addresses a matter of public concern and "occupies the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452–53 (2011) (citations omitted). The Publisher's reporting is such speech for two independent reasons, set out in Parts B and C.

**B. Business records can illuminate the practices readers follow.** Readers have concrete reasons to examine BAM's franchise business as a whole: its treatment of customers and consignors, the allocation of responsibility between franchisor and franchisees, and whether costs and incentives match public representations. These practices affect customers who entrust collections to stores, franchisees who invest their savings and livelihoods, employees, and local communities. An operations manual can reveal prescribed practices and corporate control; vendor arrangements can reveal required purchases, financial incentives, and constraints on store owners; store-level financial data can test explanations for franchisee disputes and the consequences of management decisions. Their significance depends on what particular information reveals about those questions.

Federal franchise regulation recognizes these subjects' consumer-protection significance. For sales subject to FTC disclosure requirements, franchisors must disclose revenue from franchisees' required purchases, 16 C.F.R. § 436.5(h)(6), the basis for any financial performance representations they choose to make, *id.* § 436.5(s), and the operating manual's table of contents unless prospective franchisees may view the manual, *id.* § 436.5(k)(6). BAM's own disclosures are public record. Its 2026 disclosure document, filed with Minnesota's Department of Commerce, reports 2025 revenue from franchisees' purchases, store revenue and gross margins,

and the manual's table of contents. The Department publishes franchise registration documents online and states that they "are public and may be copied."[1] Reporting on these subjects extends information the law treats as consumer protection, and partly as public record, to customers and existing franchisees.

The Supreme Court likewise recognizes economic information's public value in informing business regulation. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). A confidentiality label does not remove such subjects from public concern. In a source-disclosure dispute over online reporting on an unreleased Apple product, the California Court of Appeal rejected Apple's contention that "the public has no right to know a company's trade secrets": "[l]abeling such matters 'confidential' and 'proprietary' cannot drain them of compelling public interest." *O'Grady v. Superior Court*, 139 Cal. App. 4th 1423, 1475 (2006). Its reasoning is persuasive here: business reporting can have substantial public value independent of governmental misconduct.

**C. BAM's interactions with police make the reporting a matter of governmental accountability.** The press serves "as a powerful antidote to any abuses of power by governmental officials." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). The Publisher describes BAM personnel's police complaints, arrests, a raid, and related litigation and public meetings. Decl. of Anonymous Non-Party Publisher ¶¶ 12–16, ECF 20 ("Publisher Decl."). Its reporting traces police involvement to a consignment dispute predating the events in *Schneider*: an April 2025 Keizer police report records a store's warning, attributed to BAM's corporate loss

[1] BAM Franchising, Inc., Franchise Disclosure Document, Items 8, 11 & 19, Ex. E (issued Apr. 8, 2026), Minn. Dep't of Commerce CARDS Doc. No. 36508-202605-19; Minn. Dep't of Commerce, Franchise Registration (describing the Commerce Actions and Regulatory Documents Search (CARDS)).

prevention, that a customer seeking his consigned collection's return might lead an attack on the store, and the officer's assessment that the underlying online comment was not a direct threat.[2]

Other coverage examines disputed statements by BAM management to police. KSL reports recorded calls in which CEO Ammon McNeff says Schneider and his companions threatened to burn BAM's offices and kill people and refused to leave, alongside Schneider's contrary account.[3] The BAM Map contrasts a trespass affidavit placing Schneider inside BAM's office with video showing the encounter in a common hallway,[4] and traces McNeff's calls for an arrest before Schneider's first arrest and his communications with police before the March 11 raid.[5] That day's Orem police body-camera footage shows McNeff calling Schneider a "sociopath" and attributing this to possible childhood abuse, citing a sex-offense conviction of a man he describes as Schneider's relative.[6] KSL also reports a McNeff family member's claim that a sniper associated with Schneider fired at a family home under construction; officers in footage Schneider played attributed the broken window to a construction worker.[7] These accounts raise questions about complaint accuracy, police verification, and criminal enforcement

[2] The BAM Map, *He called to ask if his LEGO was still in the store. The police warned him* (Aug. 6, 2026) (examining Keizer Police Report KZP25005441). Proposed Amicus requests that the Court take judicial notice of the publications cited in this memorandum solely for the fact of their publication and the information they placed in the public realm, not for the truth of their contents. *See Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016); *In re Church of Jesus Christ of Latter-day Saints Tithing Litig.*, 785 F. Supp. 3d 1009, 1026 n.127 (D. Utah 2025), *aff'd*, No. 25-4068, slip op. at 13 (10th Cir. Aug. 31, 2026).
[3] Emily Ashcraft, *Lego saga updates: Reckless Ben posts new video as federal court lifts ban*, KSL.com (July 7, 2026).
[4] *The BAM Map, BAM had Reckless Ben charged with trespassing in a hallway it does not own (Aug. 4, 2026).*
[5] The BAM Map, *"Somebody has to be arrested to show that they can't continue to do this," Ammon McNeff told AFPD* . . . (Oct. 19, 2026) (title shortened).
[6] Orem Police Dep't, Body-Worn Camera Video AXR A6366U (Officer Abrams) (Mar. 11, 2026), at 14:29:57, published by The BAM Map.
[7] Ashcraft, *supra* note 3; *see also* Publisher Decl. ¶ 16 (describing former BAM chief executive Daniel McNeff's public post reporting a shot-out window at his home).

in a business dispute.

In a related police-misconduct action pending in this District, Schneider's companions allege that officers detained a process server, continued holding her after Joshua Johnson called the papers fake and the Oregon court confirmed the case was real, seized a phone, and conducted an armed raid on a warrant affidavit the police chief called "one of the biggest places where we screwed up." Compl. ¶¶ 68–77, 105–120, 179, *Norcross v. City of American Fork*, No. 2:26-cv-01008-RJS (D. Utah Oct. 14, 2026), ECF 1; *see* Publisher Decl. ¶ 7(b) (Johnson is BAM's co-plaintiff against Schneider). These are allegations against the City and its officers, not findings; BAM is not a party. They document a public controversy over whether corporate accusations prompted improper government action. The BAM Map's city council reporting describes demands for independent police review and officer accountability, discussion of the Schneider matter, and concerns about police misconduct's cost to taxpayers. ECF 20 ¶ 12(j) & n.14.[8] Readers need independent reporting to evaluate those concerns and officials' responses.

**D. Those public concerns deserve substantial weight before identities are disclosed.** Proposed Amicus brings experience as a reader and pseudonymous publisher. He published the police-misconduct video described above without a personal byline to focus attention on the events depicted and, at the time, would have been less likely to publish under his own name. That experience informs his support for the identity protections requested in ECF 18 and 21. Although disclosure to outside counsel alone would reduce the risk of wider dissemination, it would still reveal the disputed identity to counsel pursuing its disclosure before the Court determines whether disclosure is warranted.

[8] The BAM Map, *American Fork called a hearing about a tax increase . . .* (Aug. 12, 2026); The BAM Map, *The night after the sheriff served his son . . .* (Sept. 23, 2026) (titles shortened).

The First Amendment protects communication "to its source and to its recipients both." *Va. State Bd.*, 425 U.S. at 756. The Publisher declares that sources requested confidentiality and that ECF 6 has caused it to withhold reporting. Publisher Decl. ¶¶ 9, 11. Compelled identification of the Publisher or its sources thus threatens readers' access to reporting on business practices and governmental accountability, including how a commercial dispute became arrests, federal civil-rights litigation, and a question of municipal governance.

BAM invokes the public interest in enforcing confidentiality obligations and protecting trade secrets. Opp. at 8–9. Those interests matter, but "[w]hen two public interests collide, it is no answer to simply point to one and ignore the other." *O'Grady*, 139 Cal. App. 4th at 1476. The Court must weigh them against continued reporting and the chilling effect of compelled identification, considering BAM's need for identifying information in particular records, available alternatives, and the burden on reporting. *See Silkwood*, 563 F.2d at 438. The balance here weighs heavily in favor of protection. Proposed Amicus supports ECF 23's requested relief, including quashing or narrowing the subpoenas to protect the Publisher's and its sources' identities.

Respectfully submitted on October 30, 2026,

/s/ Gregory C. Belmont
Gregory C. Belmont
Proposed Amicus Curiae, appearing on his own behalf